Fern KEATON

v.

**HANCOCK COUNTY BOARD
OF EDUCATION**

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

April 2, 2003 Session.

April 30, 2003.

Permission to Appeal Denied by
Supreme Court Oct. 27, 2003.

Floyd W. Rhea, Sneedville, Tennessee, for the appellant, Hancock County Board of Education.

Mark S. Stapleton, Rogersville, Tennessee, and W. Lewis Jenkins, Dyersburg, Tennessee, for the appellee, Fern Keaton.

Before CHARLES D. SUSANO, Jr., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

## OPINION

This is a personal injury action arising out of a workplace accident not covered by the Worker's Compensation Law.[1] Fern Keaton sued her employer, the Hancock County Board of Education, alleging that it was negligent in failing to maintain the electrical appliances in her kitchen work area in a safe working condition and that this negligence was the proximate cause of the injuries and damages she sustained when she was electrocuted while using one of the appliances. The trial court, sitting without a jury, found the defendant guilty of 66–2/3% fault and assigned the balance of the fault to the plaintiff. The plaintiff was awarded $50,000 in damages, which amount represents the defendant's fault-based share of the total damages. The defendant appeals, contending (1) that it is immune from suit pursuant to Tenn.Code Ann. § 29–20–204 (2000);[2] (2) that it was not negligent; and (3) that any negligence it may have committed is outweighed by that of the plaintiff's. By a separate issue, the plaintiff argues that the trial court erred in assigning any fault to her. We

1. The appellant's brief recites that it "is exempt from the Worker's Compensation Act." The trial court's memorandum opinion reflects that "by agreement of counsel the case was tried pursuant to the provisions of the Tennessee Governmental [Tort] Liability Act."

2. Tenn.Code Ann. § 29–20–204 provides, in pertinent part, as follows:

    (a) Immunity from suit of a governmental entity is removed for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement owned and controlled by such governmental entity.

    (b) Immunity is not removed for latent defective conditions, . . .

The definition of "governmental entity," set forth in Tenn.Code Ann. § 29–20–102(3) (2000), includes a school district.

modify the trial court's judgment for the plaintiff. As modified, it is affirmed.

## I.

On October 14, 1999, the plaintiff was at work in her capacity as the kitchen manager at Hancock County High School when she received a severe electrical shock for several seconds. She yelled out that she had been shocked. Other kitchen workers ran to her side as she passed out on the floor. Witnesses testified that her breathing either ceased or became very weak. The intervention of a coworker and a paramedic, who performed CPR, maintained her breathing. She was airlifted to a hospital in Knoxville where she was treated for several days. Following her discharge, she remained disabled and since then has been unable to maintain gainful employment or carry out her everyday household activities.

The incident occurred as the plaintiff was preparing breakfast. When she was electrocuted, she was holding a dish towel in one hand and was touching the cool part of the stove. She extended her right hand to a warmer, which was then turned off, intending to brace herself against it. When her right hand touched the warmer, she received a shock and her hand was bound to the warmer for a short period of time.

The defendant had prior knowledge of electrical problems in the kitchen. On several occasions, the school system's food service supervisor had been notified of incidents involving employees being shocked. One witness recalled telling the school system director words to the effect that the shocks were strong enough to "shock the water ... out of you," apparently [3] meaning the shocks were strong enough to

cause one to urinate. The members of the Hancock County Board of Education apparently were never made aware of the problems. The food service supervisor testified that she did not appreciate the seriousness of the situation. Rather, she presumed that carelessness on the part of the workers in the kitchen had led to the incidents that occurred prior to the plaintiff's injury. The record reflects that the plaintiff, as a manager, apparently had the authority to order repairs in the kitchen. She never directly ordered such repairs. However, on October 6, 1999—eight days before she was injured—she told the Director of Schools for the county that employees in the kitchen had been shocked. The trial court's opinion makes no mention of the plaintiff's supposed authority to order repairs. Workers in the kitchen testified that they feared being discharged if they refused to work in the kitchen because of the electrical problems.

The defendant did make some attempts to fix the problems in the kitchen. However, it appears that, for the most part, the defendant hoped to delay the necessary repairs until the initiation of a large school renovation project planned for the near future. Prior to the plaintiff's injury, the food service supervisor contacted four different service providers about inspecting the kitchen. Three of those called had been to the kitchen prior to the incident involving the plaintiff. The first person who attempted to repair the problems was the school system's maintenance man. The testimony reflects that he had no training with respect to electrical work and clearly lacked the skills and expertise to make a qualified diagnosis or the necessary repairs. In fact, he made statements

---

**3.** When the witness was asked if she used a different word than "water," she testified that

"I'd rather not say."

to the effect that he did not know anything about testing for and diagnosing electrical problems associated with the appliances. The second individual who came to the kitchen owned a local heating and cooling business and had some electrical expertise, but he was not a licensed electrician. He was summoned primarily to deal with shocks caused by a walk-in freezer. He testified that prior to the plaintiff's injury, he went to the kitchen to work on something about every other week. He ran electrical tests on the stove and the warmer that revealed low voltage "leaking" from those appliances. However, he did not test for amperage, a measure of an electrical current's strength, as he lacked the equipment to do so. He was unable to correct the problems. Shocks associated with other kitchen appliances persisted between his last visit to the kitchen and the date of the plaintiff's injury. The third man was a licensed electrician but was only summoned to work on the dishwasher and burned-out "eyes" on the stove. By coincidence, the day of the plaintiff's debilitating shock, an electrician came to the kitchen for the purpose of evaluating the overall electricity problems. The call for this electrician was made eight days before the injury. The record does not reflect whether it would have been possible to get an electrician sooner, but the defendant waited for this particular electrician because he was the one recommended by the architects in charge of the planned renovation.

The record reflects that the plaintiff failed to wear rubber gloves available to her at the time of her injury. The plaintiff claimed that she would wear the gloves while cleaning the equipment. While acknowledging that the gloves could have possibly reduced the risk and power of shocks, she stated that they were too large and cumbersome to wear and pick things up while cooking. The plaintiff also testified that she ordered thinner, smaller rubber gloves but that they did not arrive prior to the incident.

As previously mentioned, the trial court found that the defendant was negligent. It further found that the defective condition of the kitchen's electrical system was not latent, as the Director of Schools had prior knowledge of the defect and waited eight days for the architect-recommended electrician to evaluate the problem. It is clear that the food service supervisor had notice of the electrical problems even before the Director. Consequently, the trial court found that the defendant's immunity was waived pursuant to the provisions of Tenn.Code Ann. § 29–20–204. However, the trial court reduced the plaintiff's damages by one-third to reflect her comparative fault. This fault, according to the court below, arose from the plaintiff's awareness of the defective condition that caused her injury. The court found that by continuing to work with knowledge of the existence of the electrical problems in the kitchen, the plaintiff was guilty of negligence.

## II.

### A.

The defendant makes four contentions. First, it contends that under Tenn.Code Ann. § 29–20–204, it is immune from this suit. That statute is part of the Governmental Tort Liability Act, Tenn.Code Ann. § 29–20–101, *et seq.* (2000 & Supp.2002) ("GTLA"). Pursuant to Tenn.Code Ann. § 29–20–204, a governmental entity is not subject to tort liability when an injury is caused by a *latent* defect in a public building. The defendant argues that any defect in the Hancock County High School kitchen was latent. Hence, so the argument goes, the defendant's immunity for the conduct alleged in this case was not waived by the GTLA.

The defendant next contends that it was not negligent with respect to the condition of the kitchen at Hancock County High School. It argues that whenever it was informed of any electrical problems in the kitchen, it took steps to fix such problems. Therefore, the defendant urges that its behavior satisfied its duty to provide its employees a safe place to work.

As a further defense, the defendant contends that, even assuming its conduct amounted to negligence, the plaintiff was 50% or more at fault. The defendant points to the fact the plaintiff was not wearing rubber gloves that could have insulated her from harm at the time of the incident. In addition, the defendant argues that as the kitchen manager, the plaintiff had the authority to arrange for repairs. Also, the defendants assert that the plaintiff was negligent in failing to properly report the kitchen's electrical problems. Her comparative fault, according to the defendant, bars the plaintiff's recovery.

Finally, the defendant contends that the plaintiff's recovery is barred by her assumption of the risk. The defendant argues that by continuing to work in the kitchen area with knowledge of the electrical problems, she assumed the risk that such problems might cause her injury. The defendant contends that the plaintiff cannot recover against it because she could have avoided the injury altogether.

### B.

The plaintiff argues that the defendant is not immune from this negligence action. She contends that the particular defect in the kitchen's electrical system could have been discovered and remedied by a licensed electrician had one been called. It is her position that the defendant was chargeable with such knowledge as would have prompted a reasonable person to call an electrician at an earlier time. The plaintiff urges that the defect was not latent, and that, consequently, the defendant's immunity is waived.

The plaintiff further contends that the defendant was negligent. She asserts that the trial court reached the correct conclusion when it decided that the defendant owed a duty of care to the defendant as an employee in the Hancock County High School kitchen, and that it had breached its duty when it failed to keep the kitchen's electrical system in good repair. This failure, according to the plaintiff, resulted in an unsafe workplace.

Finally, the plaintiff contends that the trial court correctly concluded that the defendant's fault was greater than her own. In fact, she takes the position that the trial court erred by assigning any fault to her. The plaintiff opines that "[a]n employer or governmental entity that fails to respond to repeated complaints about a dangerous condition in its work place, fails to provide qualified, competent persons to review or repair such dangerous conditions, and ignores the dangerous condition as owing to its employees' carelessness is one hundred percent at fault for injuries to its employees caused by the dangerous condition."

### III.

This is a non-jury case and, as such, is subject to our *de novo* review upon the record of the proceedings below. As mandated by Tenn. R.App. P. 13(d), there is a presumption that the trial court's findings of fact are correct and we must honor that presumption unless the evidence preponderates to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993). There is no presumption as to the correctness of the trial court's conclusions of law. *See Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn.

1996). As this is a case involving comparative fault, it is important to note that the assessment of the parties' relative fault is one of fact, carrying the aforementioned presumption of correctness. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn.1995). Our *de novo* review is subject to the well-established principle that the trial court, having seen and heard the witnesses testify, is in the best position to judge their credibility. *See Bowman v. Bowman*, 836 S.W.2d 563, 567 (Tenn.Ct. App.1991). Great deference must be shown to the trial court's credibility determinations. *Id.*

## IV.

### A.

The defendant argues that the GTLA does not provide for a waiver of its sovereign immunity from this negligence action. Tenn.Code Ann. § 29–20–204 provides, in pertinent part:

(a) Immunity from suit of a governmental entity is removed for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement owned and controlled by such governmental entity.

(b) Immunity is not removed for latent defective conditions. . . .

Under this language, immunity is not waived for an injury caused by a latent defect. The Supreme Court has defined a latent defect as follows:

"latent defect" has been defined as "[a] hidden or concealed defect. One which could not be discovered by reasonable and customary inspection." Black's Law Dictionary, 794 (5th ed.1979). The Utah Supreme Court, in construing a statute which, like our own, provided that governmental "[i]mmunity is not waived for latent defective conditions,"

also held that a latent defect is "[a] defect which reasonably careful inspection will not reveal."

*Hawks v. City of Westmoreland*, 960 S.W.2d 10, 17 (Tenn.1997) (citation omitted).

■ In the instant case, the unsafe workplace resulted from electricity leaking from kitchen appliances. The individuals retained by the defendant to check these appliances tested them for voltage and not amperage. They were not licensed electricians. The heating and cooling specialist stated that he did not have the equipment to conduct the amperage test. He admitted that the amperage level, and not the voltage reading, is the critical issue in determining whether an electrical current could cause injury. Therefore, a test to determine amperage would have been reasonable under the circumstances and the defendant failed to see that such a test was conducted.

The defendant knew a systemic problem existed. The record shows that many appliances in the kitchen caused electrical shocks, and that the defendant made attempts to fix them that ranged from an honest attempt by the heating and air conditioning worker to perfunctory glances by the maintenance man. During these repair attempts, the people brought in by the defendant never conducted the tests that would have been reasonable and customary given the fact that electrical shocks in the kitchen were still known to occur as of the day the plaintiff was injured. The defect was one that "could . . . be discovered by reasonable and customary inspection." *Id.* Therefore, the defect in the electrical system was not latent, and the defendant's immunity is removed under the language of Tenn.Code Ann. § 29–20–204.

### B.

The defendant claims that its conduct with respect to the electrical system in the kitchen was reasonable under the circumstances and, hence, does not constitute negligence. The evidence simply does not support this contention. We have described the duty of care owed an employee by an employer thusly:

The master owes the duty of ordinary care to prevent injury to the servant in the work, and he is bound to use such care to furnish the servant a reasonably safe place and safe appliances for the work. This duty of the master is personal, continuous, and non-delegable.

*Overstreet v. Norman,* 44 Tenn.App. 343, 349, 314 S.W.2d 47, 50 (1958) (citations omitted). As was the case in *Overstreet,* the instant action does not fall under the worker's compensation statutory scheme but rather is controlled by general principles of negligence and the GTLA.

■ The electrical problems in the instant case were known to the plaintiff's immediate supervisor as well as the Director of Schools. The defendant failed to bring in qualified personnel to evaluate and fix the problem. As a result of this persistent problem, the plaintiff was injured. We find that the evidence does not preponderate against the trial court's finding that the defendant was guilty of negligence that proximately caused the plaintiff's injury.

### C.

The defendant also argues that even if it were negligent with respect to a patent condition in the kitchen, the plaintiff's negligence was equal to or exceeded its own. Therefore, so the argument goes, the plaintiff's recovery is barred under the doctrine of comparative fault. *See McIntyre v. Balentine,* 833 S.W.2d 52 (Tenn. 1992). As support for its position, the defendant points to two pieces of evidence. First, the plaintiff failed to wear her rubber safety gloves when the accident occurred. Second, the defendant opines, the plaintiff was negligent when she continued to work under the dangerous conditions the kitchen presented despite her knowledge of the potential peril and by failing to use her authority to have the electrical problems repaired. The plaintiff, on the other hand, contends that the trial court erred by assigning fault to her.

■ The trial court did not discuss the fact that the plaintiff did not wear gloves when the injury occurred. However, the uncontradicted proof reflects that she attempted to obtain functional gloves from her employer. The plaintiff testified that she could not cook with the thick gloves. The trial court does not appear to have been impressed by the defendant's attempt to assign fault to the plaintiff because of her failure to wear the thick gloves and neither are we.

### D.

■ The defendant contends that the doctrine of assumption of risk bars the plaintiff's recovery. Clearly, the defendant is referring to the doctrine of implied assumption of risk. The Supreme Court has clearly stated that the doctrine of assumption of the risk has been subsumed into comparative fault. *Perez v. McConkey,* 872 S.W.2d 897, 906 (Tenn.1994). The defendant argues that the plaintiff impliedly assumed the risk by continuing to work in the kitchen while knowing of the potential danger. The trial court was correct in dealing with this evidence as a part of the comparative fault analysis. The defendant's implied contention that the plaintiff's assumption of the risk serves as an automatic bar to her recovery is no longer the law in this state. *Id.*

## V.

The trial court assigned one-third of the fault to the plaintiff, noting that

> because the plaintiff continued to work with these damaged or faulty kitchen appliances and knew the danger or should have known the danger involved, her award of damages are reduced 33–1/3% because of her negligence, . . .

We respectfully disagree with this conclusion.

&#9644; The comparative fault analysis must take into consideration the total context of the injury-causing incident, including the relationship of the parties. *See Varner v. Perryman,* 969 S.W.2d 410, 411–12 (Tenn.Ct.App.1997). It is clear to us that the defendant had a responsibility to the plaintiff and the other employees in the school kitchen to provide them a safe place to work. This it failed to do. The plaintiff was completely blameless in this failure. When she notified the Director of Schools regarding the problem, she had done all that she was required to do.[4] Furthermore, once her employer assumed its responsibility to address the problem, it was not the plaintiff's place to "step on the employer's shoes" by seeking to arrange for repairs on her own. Her failure to do any more than she did does not amount to negligence.

As previously noted, the failure of the plaintiff to wear the heavy gloves cannot be considered negligence. These type gloves may be appropriate for outside construction work or work in a steel mill or even cleaning functions in a school kitchen, but there is nothing in the record suggesting that they were appropriate for cooking duties—duties that require some measure of dexterity. We do not find evidence that the plaintiff's failure to wear the heavy-duty gloves constituted negligence that proximately caused or contributed to her injuries.

The trial court emphasized the fact that the plaintiff continued to work despite her knowledge of electrical problems in the kitchen. We do not believe she can be faulted for this behavior. While it is true that she knew there were electrical problems in the kitchen, she also knew that the defendant had arranged for individuals to diagnose and correct the problems. She had a right to believe—and every reason to believe—that the defendant had or would properly address its responsibility to provide her a safe place to work. Certainly, there is no proof in the record that she in any way caused or contributed to the problems or did anything to exacerbate it.

It is important to realize that kitchen work is, at best, basically semi-skilled work and is probably more accurately classified as unskilled labor. Jobs in this category are not that easy to find. We cannot blame the plaintiff for continuing to work in the school kitchen. People have to work for a living. It is incongruous to permit an employer who is notified of an unsafe condition and who is legally responsible for correcting it but fails to do so to criticize one of its employees for continuing to work in the unsafe work environment that the employer's own neglect has permitted to continue to exist.

While the trier of fact has "considerable latitude in allocating percentages of fault," it is clear that appellate courts have the power to re-allocate fault when the evidence preponderates against the trial court's fault-finding. *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn.

---

4. The proof reflects that the kitchen employees repeatedly complained about and otherwise reported the electrical problems to their supervisors.

1995). *See also Cross v. City of Memphis,* 20 S.W.3d 642, 644–45 (Tenn.2000).

We hold that the evidence preponderates against the trial court's finding that one-third of the fault should be assigned to the plaintiff. We hold the evidence clearly preponderates that the defendant was 100% at fault for the incident that caused the plaintiff's injuries and damages. Accordingly, we modify the trial court's judgment so as to assign 100% of fault to the defendant. It results that the plaintiff's award is increased to $75,000.

## VI.

The judgment of the trial court is modified so as to allocate 100% of fault to the defendant. As a consequence, the award to the plaintiff is increased to $75,000. As modified, the judgment of the trial court is affirmed. This case is remanded to the trial court for enforcement of the judgment and for collection of costs assessed below. Costs on appeal are taxed against the appellant Hancock County Board of Education.